THE LAW FIRM OF

# CÉSAR DE CASTRO, P.C.

ATTORNEY AT LAW

The District
111 Fulton Street - 602
New York, New York 10038
631.460.3951 Office
646.285.2077 Mobile
646.839.2682 Fax
cdecastro@cdecastrolaw.com
cdecastrolaw.com

May 25, 2022

*Via* ECF

The Honorable Valerie E. Caproni
U.S. District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

                Re:    *United States v. Carl Wilbright,* 20 Cr. 667 (VEC)

Dear Judge Caproni,

This Court should sentence Carl Wilbright to a period of home incarceration. We recognize that this would be a significant variance from the recommendation of the advisory United States Sentencing Guidelines (the "Guidelines). However, I expect the government will agree that the Guidelines are artificially high as applied to Mr. Wilbright because they include the unjust powder to crack-cocaine sentencing disparity. If the disparity between crack and powder cocaine were eliminated, as recommended by the Department of Justice and being considered by pending legislation, Mr. Wilbright would be facing an advisory Guidelines range of 37 to 46 months' imprisonment. If the Court were to start at a point within that advisory range, and then consider Mr. Wilbright's history and characteristics as well as his extensive medical needs that the Bureau of Prisons would be hard-pressed to provide, I am confident that the Court will agree that a period of home incarceration is appropriate.

Mr. Wilbright is a forty-nine-year-old father to two adult children and grandfather to two minor children. He is actively involved in the lives of his children and grandchildren and an integral to caring for his grandchildren. He is wheelchair bound as a result of being shot three times in 2002. Mr. Wilbright is under the constant care of physicians and pain management professionals. He takes close to ten medications. The Bureau of Prisons is simply not equipped to handle the level of care needed by Mr. Wilbright. Should he be sentenced to imprisonment, he will undoubtedly need to be imprisoned in a Bureau of Prisons hospital facility that will not, based on its track record, provide Mr. Wilbright with the necessary medical treatment.

Accordingly, we respectfully submit that the Court should first determine that the more just and appropriate starting point for sentencing is 37 to 46 months' imprisonment, then vary downward

from that range and sentence Mr. Wilbright to home incarceration to appropriately provide him with the needed medical care in the most appropriate manner.

**I.       The United States Advisory Sentencing Guidelines Range and Pre-Sentence Report**

Mr. Wilbright pled guilty, pursuant to a plea agreement, in which he and the government agreed on the application of the advisory Guidelines.  The Probation Office's calculation in the Pre-Sentence Report ("PSR") largely mirrors that contained in the plea agreement.  The only discrepancy between the two is the calculation of Mr. Wilbright's criminal history score.  We agree that the calculation contained in the PSR accurately calculates Mr. Wilbright's criminal history score.  Accordingly, Mr. Wilbright agrees that he faces an advisory Guidelines range of 108 to 135 months' imprisonment.  However, as the government has acknowledged in each of the sentencings of Mr. Wilbright's co-defendants who pled guilty to narcotics related offenses, his advisory Guidelines range is driven by the weight of the crack cocaine for which he is being held responsible.  As I expect the government to acknowledge in its sentencing submission, the Court can and should, consistent with the law and current sentencing framework, consider the powder to crack-cocaine disparity in assessing the Section 3553(a) factors.

Mr. Wilbright is responsible for distributing between 280 and 840 grams of crack cocaine, resulting in a base offense level of 30.  If the Guidelines that apply to powder cocaine were instead applied, Mr. Wilbright's offense level would be ten points lower, resulting in an advisory range of 37 to 46 months' imprisonment.

The Probation Office recommends that the Court sentence Mr. Wilbright to the low-end of the advisory Guidelines and specifically does not take "into consideration pending legislation (the EQUAL Acts) which seek to eliminate the disparity in authorized sentences for crack cocaine versus powder cocaine."  *See* PSR at 23-24.  The Court can and should take into consideration the potential application of the EQUAL Acts to Mr. Wilbright and use that advisory Guidelines range as its starting point.

**II.      Home Incarceration is Sufficient to Achieve the Goals of Sentencing and Provide Mr. Wilbright with the Needed Medical Care in the Most Effective Way**

As noted above, if the Court appropriately utilizes the advisory Guidelines range applicable to powder cocaine, Mr. Wilbright is facing 37 to 46 months' imprisonment before the Court considers the remaining 18 U.S.C. § 3553(a) factors.  Mr. Wilbright's history and characteristics, including his age, adjustment to Pretrial Supervision, and active positive involvement in the lives of his daughters and grandchildren factor in favor of a downward variance.  Furthermore, Mr. Wilbright is confined to a wheelchair as a result of being shot three times in 2002 and he suffers from several medical conditions which cause him to be frequently treated by physicians and pain management professionals.  The Bureau of Prisons will not provide Mr. Wilbright with the necessary medical care in the most effective manner.  His treatment should be left to his current specialists.  Accordingly, this Court should find that the appropriate starting point for Mr. Wilbright's sentence is 37 to 46 months' and it should then vary downward based on his history and characteristics and medical needs and sentence him to a period of home incarceration.

1. <u>Mr. Wilbright's History and Characteristics Favor a Downward Variance</u>

The offense to which Mr. Wilbright pled guilty is serious. He regrets and is remorseful for being involved in the conspiracy. While the seriousness of the offense certainly factors against a variance from the Guidelines (as they would be under the EQUAL Acts), his history and characteristics factor in favor of a downward variance.

The PSR accurately recounts Mr. Wilbright's history and characteristics. *See* PSR at ¶¶ 70-106. Mr. Wilbright is forty-nine-years-old. He has two adult children and two grandchildren, ages six and eleven. While Mr. Wilbright describes his upbringing as nice and at least one of his siblings recounts how their mother spoiled Mr. Wilbright, he is the product of a broken home. His father left the family when Mr. Wilbright was only five years old. His mother worked incredibly hard to provide for him and his family. Growing up, his siblings describe him as taking on a provider role in the family at a very young age. Throughout his life he has provided emotionally and financially to his immediate, extended, and fiancée's family. His oldest sister Renee Spradley recounts:

> Our father was an abusive man, in his absence, Carl became the man of the family with the primary goal to ensure our mother, our sisters and I were always ok. Outside of his immediate family he also cares for both his grandmothers (one recently passed away) like his own mother along with his aunts on both sides of his family. He would go visit his grandmother in Florida and cook for her, take her to get her nails and hair done, mow her yard, etc.

*See* Letters of Support Annexed Hereto at Exhibit "A." His oldest niece Deja Williams writes about how Mr. Wilbright helped her fill a parental void:

> His childhood is a prime example of how the absence of a father /father figure affects the life of any individual and we are hopeful his children and grands do not have to endure this upbringing. He eventually took on the role of uncle to me whereas he filled in when my parents asked of him. I remember getting off the school bus, seeing my uncle waiting there for me and being so happy. Even back then he'd encourage me to work hard and play later as he still does today. . .
>
> Today not only does he fill a loving uncle title but he also roles as a father and "Pop" to his grandchildren who adore him. His grandson, who is absolutely brilliant I might add, admires his grandfather and has since the passing of his own father as a baby. His articulate granddaughter is his shadow and always wants to be with him. He even has to drop her off and pick her up from school most of the time. My uncle, knowingly and unknowingly, is the man of our family especially to those like myself who have lost our fathers and we need him.

*Id.* His daughter Alexus describes how Mr. Wilbright helps her:

> Right now he currently helps me out with my daughter he picks her up from school while I'm at work. Without him I wouldn't be able to maintain

> employment.  He takes her to the places she's always mentioning to him such as gymnastics, target & etc.  He just always try's his best to be that Dad role for her.  It's going to crush her heart when she realize her grandfather won't be around for a while.  My dad is well aware of his charge and takes full responsibility for his actions.

*Id.*  He plays that role with his fiancée's children as well.  Ms. Wan writes that Mr. Wilbright has been "so loving and caring to my children and has made parenting so much easier with him being a part of their lives.  He is POP to them.  He truly loves and supports them as if they were his own birth children . . . Pop [h]as been the only father figure in their life." *Id.*

The letters from his family also show how they have seen a change in Mr. Wilbright over the past year and they express their optimism that Mr. Wilbright, now forty-nine-years-old, has turned a corner.  Ms. Spradley writes:

> As most parents, he helps both of his daughters take care of their children; a respectful, independent granddaughter and an inquisitive, smart grandson who is on the honor roll.  He drops them off and picks them up most days.  Stepping up to help his daughters with their children has been his saving grace.  It's given him something constructive to do and look forward to.  He sees the value he has on their lives and wants to do better not just for himself but also to make them proud."

*Id.*  The impact of this case and his potential jail sentence has had a profound impact on Mr. Wilbright at this stage of his life.  He certainly has a criminal history (serious offenses nineteen and thirteen years ago) and this case is very serious, however, he has adjusted extremely well to Pretrial Supervision and has focused on bettering himself and those around him.  Furthermore, as noted above and discussed more below, he does all of this while struggling with serious health issues, largely a result of being shot three times in 2002.   Accordingly, Mr. Wilbright's history and characteristics factor in favor of a downward variance.

   2.   **If Imprisoned, Mr. Wilbright Will Not Receive Adequate Medical Treatment for His Numerous Physical Conditions**

Mr. Wilbright is not physically well and suffers from several conditions for which he takes several medications.  In 2002, he was shot and injured as a result of a random act of violence.  He was shot in the hip, stomach, and right elbow while waiting for a friend in an elevator lobby.  He suffered pelvic fractures, nerve damage, a punctured colon, and partial paralysis.  He has had numerous surgeries in which screws, plates, rods were used to hold him together.  Due to his punctured colon, he required a temporary colostomy bag for a period.  Since that time, he has been confined to a wheelchair although at times he prefers using crutches.

Since 2002, Mr. Wilbright has required constant care from physicians and pain management professionals.  *See* Medical Records Annexed Hereto at Exhibit "B."[1]  Since he was shot, he has

---

[1] Mr. Wilbright's medical records will not be publicly filed and will be provided to the Court and the government separately.   We ask that his medical records remain under seal.

suffered constant pain and numbness for which he is prescribed several medications and undergoes regular physical therapy.  *Id.*  Mr. Wilbright has a long list of infirmities for which he is being treated regularly, including:

   a. Chronic Pain;
   b. Hypertensive Disorder;
   c. Neck Pain;
   d. Chronic Lower Back Pain;
   e. Sacral and Lumbar Radiculopathy (Sciatica);
   f. Foot Pain and Foot Numbness;
   g. Tremors;
   h. Sensation of Heaviness in the Limbs;
   i. Upper Limb Tingling/Burning; and
   j. Drop Foot.

*Id.*  He takes several medications, including:

   1. Lisinopril (for High Blood Pressure);
   2. Amlodipine (for High Blood Pressure and Chest Pain);
   3. Meloxicam (for Arthritis and Joints);
   4. Gabapentin (for Seizures and Nerve Pain); and
   5. Baclofen (Muscle Relaxer).

*Id.*

If this Court were to sentence Mr. Wilbright to a period of imprisonment, even before the onset of the COVID-19 global pandemic that has extraordinarily limited the resources and the ability for the Bureau of Prisons ("BOP") to provide adequate medical treatments to inmates, the BOP would have been hard pressed to meet his medical needs.  The BOP has proven unable to provide effective medical care for people like Mr. Wilbright even in ordinary times.

In 2016, DOJ's Office of Inspector General ("OIG") found that the BOP experienced chronic medical staffing shortages and failed to take adequate measures to address them, endangering the safety and security of its institutions.  *See, e.g.*, U.S. Dep't of Justice Office of the Inspector Gen., Review of the Federal Bureau of Prisons' Medical Staffing Challenges i-ii, 1-2 (Mar. 2016), available at https://www.oversight.gov/sites/default/files/oig-reports/e1602.pdf.  From 2010 to 2014, the BOP's total medical staff was "approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be 'ideal care,' and 12 institutions were so medically understaffed that they were described as 'crisis level.'"  *Id.* at 1.  Lack of adequate staffing has resulted in medical personnel and other non-correctional staff working as guards and has made wait times for individuals to receive even routine medical care unacceptably long.  *See* U.S. Dep't of Justice, Office of the Inspector Gen., The Impact of an Aging Inmate Population on the Federal Bureau of Prisons 17- 19 (Rev. Feb. 2016), https://www.oversight.gov/sites/default/files/oig-reports/e1505.pdf ("Aging Inmate Population"); *See also* Keegan Hamilton, Sick Staff, Inmate Transfers, and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits, Vice News (Mar. 24, 2020), https://bit.ly/3eq7Rl7; *see also* Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018:

Hearing before the Subcomm. On Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. 3-4 (2019) (statement of Kathleen Hawk Sawyer), https://bit.ly/2ZJlDeG.

Mr. Wilbright, given his extensive infirmities and that he is confined to a wheelchair, would have to be designated to a medical facility.  My understanding is that there is a waiting period of several months to get into a BOP medical facility and the BOP would likely designate Mr. Wilbright to the Metropolitan Detention Facility in Brooklyn until a space opens up.  Then, even if he were designated to a medical facility, he would likely have to serve his sentence in a facility far from his family, and without effective medical care.  Mr. Wilbright needs frequent medical attention and rehabilitation services.  He has chronic pain and most recently suffered a mild stroke in August 2021.  The BOP is still reeling from the effects of the COVID-19 pandemic.  New COVID-19 variants and outbreaks have complicated operations, and it has frequently required lockdowns in facilities across the country.  Sentencing Mr. Wilbright to a BOP medical facility would not ensure that he is provided the needed medical care in the most effective manner.  Accordingly, Mr. Wilbright's extensive medical needs also factor in favor of a downward variance.

### III.    Conclusion

For all the foregoing reasons, it is respectfully requested that: (1) the Court agree with the parties that the Court should take into consideration that if the unjust sentencing disparity between crack cocaine and powder cocaine was eliminated, Mr. Wilbright would be facing an advisory Guidelines range of 37 to 46 months' imprisonment; and (2) using that advisory range as a starting point, weigh Mr. Wilbright's history and characteristics and his needed medical care, and sentence him to a period of home incarceration.  In these circumstances, a sufficient period of home incarceration is sufficient but not greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

/s/

César de Castro

cc:     Christopher Clore
        Assistant United States Attorney (*via* ECF)